IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 16, 2022

## STATE OF TENNESSEE v. TONY LEE LIGHT

**Appeal from the Circuit Court for Blount County**
No. C-26285          David R. Duggan, Judge

————————————————————

## No. E2022-00402-CCA-R3-CD

————————————————————

The Defendant, Tony Lee Light, was convicted in the Blount County Circuit Court of first degree felony murder committed during the perpetration of aggravated child abuse and second degree murder. The trial court merged the conviction of second degree murder into the conviction of first degree murder, and the jury chose to sentence him to life without parole. On appeal, the Defendant claims that the evidence is insufficient to support the convictions and that the trial court committed reversible error by allowing the State to impeach his character. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., P.J., and TIMOTHY L. EASTER, J., joined.

J. Liddell Kirk (on appeal), Madisonville, Tennessee, and Mack Garner, District Public Defender, and Matthew Elrod, Assistant District Public Defender (at trial), Maryville, Tennessee, for the appellant, Tony Lee Light.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ryan Desmond and Tracy Jenkins, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In January 2019, the Blount County Grand Jury indicted the Defendant for first degree premeditated murder and first degree felony murder committed during the perpetration of aggravated child abuse. The victim of the alleged crimes was the Defendant's five-month-old daughter.

At trial, Deputy Matt Fagiana testified that in February 2011, he was a patrol deputy for the Blount County Sheriff's Office ("BCSO"). On the morning of February 23, Deputy Fagiana responded to a call at a residence on Tammy Circle. When he arrived, a woman met him in the driveway. She was carrying the victim and was very upset. A man also was present, but Deputy Fagiana did not speak with him.

Deputy Fagiana testified that the victim "was obviously not breathing, was very blue and cyanotic and cold to the touch." He carried her to his patrol car, wrapped her in one of his patrol coats, and began performing cardio pulmonary resuscitation ("CPR"). Based on the victim's condition, Deputy Fagiana did not expect CPR to be successful, but he continued his efforts because he wanted to give the victim's family some hope. He performed CPR on the victim for five to ten minutes until emergency medical personnel arrived.

On cross-examination, Deputy Fagiana testified that because the victim was so small, he used his index and middle fingers to perform chest compressions. He also provided mouth-to-mouth ventilation.

Thirty-year-old Selena Light, the victim's mother and the Defendant's ex-wife, testified that the victim was born six weeks premature on September 4, 2010, and stayed in the Neonatal Intensive Care Unit ("NICU") at Children's Hospital in Knoxville for about three weeks. When the victim was released from the hospital, she lived with Ms. Light and the Defendant on Atkins Lane in Louisville, Tennessee.

Ms. Light testified that about one week before the victim's death, Ms. Light began staying at her father-in-law's house so that she could take care of his ex-wife, who had pancreatic cancer. Ms. Light also was taking care of the victim. On February 22, 2011, the Defendant went to work at Burger King, and Ms. Light and the victim went to Ms. Light's mother's home on Tammy Circle. Ms. Light's mother helped Ms. Light take care of the victim that day. Ms. Light was very tired, so her mother suggested that she and the victim spend the night. The Defendant was going to come to the home after his shift at Burger King. Ms. Light said that the restaurant normally closed at midnight and that the Defendant "would have gotten a ride home and probably been home around 1:00 or after."

Ms. Light testified that her father slept in one bedroom, that her mother slept in another bedroom, and that she and the victim slept in a third bedroom. The victim finished drinking a bottle at about 10:00 p.m., and Ms. Light and the victim went to bed. The victim usually slept in a bassinet, but Ms. Light had not brought the bassinet to her mother's home because she had not planned to stay there. Ms. Light put pillows around the victim, and the victim went to sleep. The State asked if a "Boppy" pillow was in the bed, and Ms. Light answered, "I think we had left the Boppy at home[.]" When the Defendant arrived,

Ms. Light told him that the victim needed to eat, and the Defendant said that he was "going to take care of it." The Defendant went into the bathroom, and Ms. Light went back to bed. Ms. Light said the Defendant did not seem to be using illegal drugs that night. However, the next day, he told her that he had "shot up" morphine in the bathroom.

Ms. Light testified that she woke sometime during the night and that she looked at the Defendant and the victim, who were in bed with her. They looked "peaceful." At about 5:00 a.m., Ms. Light reached over and touched the victim. The victim was lying on her back, and Ms. Light could not feel her breathing. Ms. Light screamed and jumped out of bed. She picked up the victim confirmed the victim was not breathing and called 911. Ms. Light began performing CPR while the Defendant was "running around the house and kind of screaming and hitting things and wasn't really paying attention to anything." Ms. Light ran outside with the victim and handed her to a police officer. The officer carried the victim to an ambulance and transported Ms. Light to the hospital. The Defendant came to the hospital later, and Ms. Light and the Defendant had their blood drawn for toxicology tests. Ms. Light began divorce proceedings against the Defendant in 2014, and their divorce was finalized in 2016.

On cross-examination, Ms. Light testified that the victim was teething at the time of her death and had been fussy for several days. Ms. Light was giving the victim Tylenol and teething tablets for the pain, and Ms. Light may have given the victim teething tablets earlier that day. Ms. Light said the tablets were discontinued several years later because "[a]pparently there was a lot of issues with them hurting children."

Ms. Light testified that when the victim was born, the victim could not suck a nipple properly, so a tube was placed through her nose for a couple of days to feed her. The victim also had to stay in the hospital a couple of extra days because she could not pass a car seat breathing test. The victim failed the test two or three times before she was allowed to go home. Ms. Light was concerned about the victim's breathing and asked that the victim be sent home with a breathing monitor, but the victim's doctor said a monitor was not necessary. In December 2010, the victim had RSV, a respiratory virus. The victim received treatment for the virus and was healthy in January 2011.

Ms. Light testified that after the victim's death, she and the Defendant had a baby boy, who was born four weeks premature. Due to the victim's death, Ms. Light was worried about her son's breathing. She asked that he be sent home from the hospital with a breathing machine, and the doctor did so. Ms. Light said that her son did not seem to have as many problems as the victim and that he was healthy and in the third grade at the time of the Defendant's trial.

On redirect examination, Ms. Light testified that after the victim's death, the Defendant kept saying he "felt guilty." Ms. Light assumed he felt guilty for not checking on the victim during the night. Ms. Light later learned the Defendant had written a letter in which he said he smothered the victim. However, Ms. Light never saw the letter. She said that although the victim was teething and fussy prior to her death, the victim was a healthy baby.

Ray Angus of the BCSO testified that he was an investigator assigned to the Blount County Jail and that he was not involved in the investigation of the victim's death. On January 18, 2019, the Defendant was an inmate at the jail and made some requests. The requests caused deputies at the jail to be concerned that the Defendant might harm himself, so Investigator Angus went to the Defendant's cell to advise him that a chaplain was available if he needed one. While Investigator Angus was with the Defendant, the Defendant "just began talking about random things." Investigator Angus said that he did not ask the Defendant any questions and that the Defendant "started talking about how he believed that his daughter had [a] staph infection, not an upper respiratory infection, that she may have gotten from dirty needles that he had." The Defendant then "started talking about the fact that his baby was fussy, so he was holding the baby and he would squeeze it -- squeeze the child until -- squeeze the fight out of the child was his words." Investigator Angus continued as follows:

> He did make a statement about the child being fussy. He had called his baby mama and could hear the child crying in the background, said that he would be there after work. He also stated that he tried to feed the child and he would put oatmeal in the child's milk, cut the nipple bigger to feed the child more, but the mother didn't like it when he did that. And then he led up to the holding of the child.
>
> . . . .
>
> He said that when he was squeezing the child -- he was squeezing the fight out of the child, the child was grabbing at his shirt. He said he just kept squeezing until the child stopped and then he fell asleep. He said he then got up and had spit-up on his shirt so he laid the child down and changed his shirt.

On cross-examination, Investigator Angus testified that he did not remember the Defendant's saying anything about hallucinations.

Deputy Richard Kindig testified that he was assigned to the Blount County Jail and that he accompanied Investigator Angus to the Defendant's cell. The door to the

- 4 -

Defendant's cell was open, Investigator Angus was just inside the cell with the Defendant, and Deputy Kindig was providing security outside the cell. Deputy Kindig said that at some point, the Defendant began talking about the victim's death. Deputy Kindig knew the Defendant had been charged with killing the victim, so the Defendant's statements "[p]iqued" Deputy Kindig's attention. Deputy Kindig said that he began listening to the Defendant and that the Defendant

> spoke about that he thought that his daughter had gotten a staph infection from dirty needles that he had been using. As a drug user he had used the needles to drain pus out of his arms and also to shoot drugs with and then he left the needles laying around. He said when he was holding his child he felt like he had given her a staph infection from the infections he had in his arms. He then went on to say that while he was driving home he got a phone call from the mother of the child. He could hear the child screaming in the background as she was trying to talk to him. He was concerned about the lack of sleep that the two of them had had. He then stated when he got home he had let her go to bed and he chose to take care of the child. He held the child and tried to feed a bottle of milk and cereal to the baby. The baby was crying and screaming and wouldn't take the bottle or he had to pull the bottle away from the baby.

> He said at that point in time he held the baby to his chest and began to squeeze. He said the child grabbed a hold of his shirt. He said that -- he compared that to wrestling someone. He said the child then went limp, let go of his shirt. He said he was trying to squeeze the fight out of the child. When the baby went limp he said he sat down and passed out. He said he remembers waking up and then laying the baby down and then he went back to sleep.

Deputy Kindig said the Defendant claimed he later woke to the victim's mother screaming. She told the Defendant that the victim was unresponsive and that they needed to call for help.

On cross-examination, Deputy Kindig testified that he was with the Defendant for about fifteen minutes and that the Defendant talked the entire time. The Defendant "acted like he needed to talk to somebody" and "was almost matter of fact." The Defendant was not nervous or excited, did not appear to be suicidal or threatening, and talked about things other than the victim. Deputy Kindig did not say anything to the Defendant and just listened. The deputy described the Defendant's conversation as "odd" but said the Defendant was not hallucinating. The Defendant claimed that he was driving a vehicle when the victim's mother telephoned him and that he could hear the victim's screaming

and crying hysterically in the background.  The Defendant did not say when the incident occurred.

Detective Doug Davis of the BCSO testified that on February 13, 2011, he went to Tammy Circle in response to an infant's death.  En route, dispatch advised him that "the father had disappeared while the mother was doing CPR on the infant."  Detective Davis arrived at the residence and spoke with one of the first responding officers.  He then went into the home.  The State showed him a photograph taken inside the residence, and he said the photograph showed a blanket on the bed where the victim had been located.  The blanket appeared to have "baby spit-up with formula" on it.

Detective Davis testified that he spoke with the Defendant.  The Defendant told him that when the Defendant got to the home after work, his wife and the victim were asleep in bed, so he got into bed and went to sleep.  The Defendant said that after his wife found the victim unresponsive, he told her to call 911, and he performed CPR on the victim. Detective Davis asked how the Defendant disappeared if the Defendant was performing CPR, and the Defendant told him that he "had went to the restroom and attempted to call his in-laws."  The Defendant said that the victim was born healthy but that she saw a doctor for RSV about one month before her death.

Detective Davis testified that he went to the emergency room and inspected the victim's body.  He did not see any injuries, but he observed lividity, which he explained was a pooling of the blood, on top of her right foot and on her back.  The victim's parents were present at the hospital and consented to having their blood drawn.  Ms. Light's blood was negative for drugs, but the Defendant's blood was positive for opiates.  Detective Davis spoke with the Defendant at the hospital.  At first, the Defendant claimed he had not used drugs or alcohol in the past twenty-four hours.  However, after the Defendant consented to the blood draw, he told Detective Davis that he "shot up an Opana pill that morning."  Detective Davis saw a needle wound in the Defendant's arm, and the wound was bleeding.  The Defendant also changed his story and claimed that after he arrived home from work, the last thing he saw before he went to bed was Ms. Light holding the victim. An autopsy was performed on the victim, and the autopsy report said that her likely cause of death was "[a]ccidental, probable layover of one of the parents on the child."  There was no evidence of a crime, so the BCSO closed its investigation.

Detective Davis acknowledged that on September 4, 2013, he requested that the investigation be reopened because he heard that the Defendant, who was in jail, had been talking about the victim's death. Detective Davis spoke with Ms. Light that day and asked her if the Defendant had ever admitted to doing "anything" to the victim.  Ms. Light said no.  After Detective Davis spoke with Ms. Light, he met with the Defendant and advised

- 6 -

him of his *Miranda* rights. The Defendant signed a waiver of rights form, and Detective Davis interviewed him. Detective Davis stated as follows:

[B]asically he told me that he had been using -- been up using drugs for several weeks. And the mother had been taking care of a sick relative of his who was dying with cancer and taking care of the child. And she had pretty much called him that night and said you've got to come home, I'm tired. And so he went home. The child was crying, wouldn't quit crying. He tried to console it and it didn't work. And he said he knew it was his fault. And I said what do you mean it's your fault. And he told me about putting the baby's head to his chest but said it was his fault. He wouldn't come out and give a whole lot of details as to that fact. But just basically it was an accident, he was sorry.

The interview was video recorded, and the State played the video for the jury. Detective Davis said that after the interview, the Defendant wrote out his statement. Sixteen days later, the Defendant sent a note to Detective Davis in which the Defendant wrote, "'I was wondering why I've not been took to court and charged on the statement I wrote you.'"

Detective Davis testified that on September 26, 2014, he received a letter from the Defendant. In the letter, the Defendant said that he was no longer taking pills and that he was "more coherent about the situation." The Defendant wrote that when he got to the home on Tammy Circle in the early morning hours of February 23, 2011, Ms. Light complained to him about helping the Defendant's "stepmom" for the past few days and told him to "watch" the victim. The Defendant was tired and using drugs, but he fed the victim a bottle of milk. He said that she was "still upset" and that he "held her on [his] chest." The Defendant later woke with the victim still on his chest. He thought she was sleeping, picked her up, and "laid her in [the] Boppy in between her mother and me." The Defendant's shirt was wet, so he took it off, threw it onto the floor beside the bed, and went back to sleep. He was later awakened by Ms. Light telling him that the victim was not breathing. The Defendant wrote in the letter, "I've always blamed myself for her death no matter if it was my fault completely or if I just caused her to choke which caused her death."

Detective Davis testified that in July 2018, he received a second letter from the Defendant. Detective Davis read the letter to the jury as follows:

I told you what happened. But some things didn't make out as true as they needed to be. As a child, I used to hold my breath and [suffocate] myself with a pillow or the ground and the grass. My feelings would hurt, it relieved tension or stress. The damn relief feels good, I might add.

. . . .

I realize I was [suffocating] the baby, really try and drain its energy. It wouldn't shut the [f*ck] up. Somewhat post traumatic or whatever the [f*ck] ever you all call it. I just got carried away, held her little arms swinging up and down, held and said Goddamn, shut the [f*ck] up. But, no, she kept crying. So I hold her a little longer, felt weakness and lifted up, frightful she may be gone. But I didn't check out the situation. I was (unreadable) that (unreadable) but staph infected still I believe somewhat or no accident cause I lifted her up at two or three to place in the Boppy above and her body limp. I guess laid on her stomach, placed paci in her mouth, but had to lay her against side of the Boppy. I'm so high I fell right back asleep till up rise of screams from [her mother].

Detective Davis testified that based on the two letters, he decided to interview the Defendant again. On August 27, 2018, Detective Davis advised the Defendant of his *Miranda* rights. The Defendant waived his rights and spoke with the officer. Detective Davis said that during the interview, the Defendant

explained how when he was a child, if he got upset or frustrated that he would suffocate himself by placing his face in the ground and grass or into a pillow to suffocate himself to do what he called drain his energy. And in the process of the interview he said he purposefully suffocated his daughter to attempt to drain her energy.

The Defendant's interview was video recorded, and the State played the interview for the jury. During the interview, the Defendant demonstrated how he pressed the victim's face into his chest until she stopped crying and went limp.

Detective Davis testified that after the Defendant's second interview, he obtained a warrant, charging the Defendant with the victim's death. Detective Davis obtained the warrant because the Defendant's latest story matched the autopsy report, of which the Defendant had no knowledge, and because the Defendant said he "purposefully suffocated" the victim.

At the conclusion of Detective Davis's direct testimony, the State played three jailhouse telephone calls placed by the Defendant to his mother on September 10, 2018, January 14, 2019, and February 27, 2019. During the first call, the Defendant told his mother that he held the victim "real, real tight" and that he was "trying to drain her energy." In the second call, the Defendant told his mother that he was "trying to drain her energy," that the victim was "fighting" him, and that he "done it just a little bit too long." During

the final call, the Defendant told his mother that he "confessed and wrote letters" and that "it's wrong not to tell something like that especially when it comes to a kid."

On cross-examination, Defense counsel mostly questioned Detective Davis about the Defendant's September 4, 2013 interview. Detective Davis acknowledged that during the interview, the Defendant said that he "was so messed up on drugs that he didn't even want to admit it to himself." The Defendant also said that the victim woke up crying and that he tried to console her but was unable to do so. The Defendant claimed he had been to Cherokee Health for "hearing voices and seeing things" and that he "lied to them so he could go ahead and get sentenced" in another case. The Defendant told Detective Davis that he attempted suicide but that his father intervened. Detective Davis spoke with the Defendant's father, but the Defendant's father told Detective Davis that "[i]t never happened." Later in the September 4 interview, the Defendant told Detective Davis that he "had seen someone that seeped through the walls while housed in the jail." The Defendant thought the hallucination was due to Risperdal prescribed to him for "hearing and seeing different things." The Defendant also said he was having nightmares. He told Detective Davis that he used drugs the night before the victim's death and that he consumed an Opana pill the morning of her death.

Detective Davis acknowledged that the Defendant mentioned a Boppy pillow several times in his statements. However, the police did not find a Boppy pillow at the crime scene. A shirt was found in the bedroom, but Detective Davis did not examine it. Spit-up was on a blanket and a sweatshirt found in the bedroom, and the sweatshirt was on the bedroom floor. The crime scene technician should have collected the sweatshirt, but the sweatshirt was not on the list of items collected from the bedroom. Detective Davis did not examine the collected evidence because the medical examiner initially ruled that the victim's death was accidental. In late 2012 or early 2013, Detective Davis signed paperwork to have the evidence destroyed. Detective Davis acknowledged that the Defendant was the only person who told him that the victim had been screaming and crying prior to her death.

Detective Davis testified that after the Defendant's interview on September 4, 2013, Detective Davis spoke with an assistant district attorney general. However, the attorney general's office did not think Detective Davis had enough evidence to arrest the Defendant for the victim's death. Detective Davis also spoke with Dr. Christopher Lochmueller, who prepared the victim's autopsy report. Detective Davis asked Dr. Lochmueller if the Defendant's story of pressing the victim's face into his chest in order to stop her crying was consistent with the findings in the autopsy report. On November 8, 2013, two months after Detective Davis spoke with Dr. Lochmueller, Dr. Lochmueller amended the report.

Detective Davis acknowledged that the "break in the case" came during the Defendant's 2018 interview when the Defendant said he purposefully suffocated the victim. Detective Davis recalled that after the victim's death, Ms. Light told him that she had put the victim to bed on the victim's stomach with the victim's head turned to the side. Ms. Light said that when she got up during the night, the victim was lying "in the same way." Detective Davis understood Ms. Light to mean the victim was still lying on the victim's stomach with the victim's head turned to the side. Ms. Light told Detective Davis that when she found the victim unresponsive that morning, the victim was lying on the victim's back. Detective Davis acknowledged that he filled out a Sudden Unexplained Infant Death Investigation ("SUIDI") report. Defense counsel showed him the report, and he acknowledged marking in the report that Ms. Light found the unresponsive victim lying on the victim's stomach. Detective Davis said that he made a mistake and that Ms. Light told him on the morning of the victim's death and again in 2013 that she found the victim lying on the victim's back.

Dr. Christopher Lochmueller testified as an expert in forensic pathology that he served as a forensic pathology consultant for about twenty counties in East Tennessee, including Blount County, and that he performed the victim's autopsy. Dr. Lochmueller said that the victim was "a healthy five-month-old who had no reason to be dead." The victim did not have any natural diseases or congenital issues, and Dr. Lochmueller did not see any obvious signs of physical trauma to her body. Toxicology tests showed nicotine in her blood, which probably resulted from secondhand smoke, but her blood was negative for alcohol, prescription drugs, and illegal drugs. Dr. Lochmueller received information that the victim had been placed on her stomach to sleep, and he saw livor mortis, pooling of the blood, on the front of the body, which indicated that she was lying face down at some point after her death. He also saw livor mortis on the back of her body, which indicated that she was placed on her back sometime after her death. Given the circumstances he knew at the time, i.e., that the victim had been sleeping with her parents, he concluded that her cause of death was "asphyxia due to overlay" by one of her parents and that her manner of death was accidental.

Dr. Lochmueller testified that in 2013, he received information that an adult had placed the victim on the adult's chest and had smothered the victim to stop her from crying. The new information "completely change[d] the circumstances from an accidental positional asphyxia type case to an intentional smothering." Therefore, Dr. Lochmueller amended the victim's autopsy report to change her cause of death to "asphyxia due to smothering" and her manner of death to homicide. The State played portions of the Defendant's video-recorded August 2018 interview for Dr. Lochmueller, and he said the Defendant's description of events was consistent with the findings in the amended autopsy report.

- 10 -

On cross-examination, Dr. Lochmueller testified that after the victim's death, law enforcement reported to the medical examiner's office that "it was an overlay." If Dr. Lochmueller had not received that information, he would have classified her cause and manner of death as "undetermined." Detective Davis later told Dr. Lochmueller that the Defendant had confessed to smothering the victim against his chest to make her stop crying. The Defendant's confession was "critical" to Dr. Lochmueller's decision to amend the autopsy report. Detective Davis did not tell Dr. Lochmueller that the Defendant was hallucinating, was seeing people walk through concrete walls, and was taking psychotropic medications. Had Detective Davis done so, Dr. Lochmueller would have asked that law enforcement continue its investigation and make sure the Defendant's confession remained unchanged when he was in a normal state of mental health. Dr. Lochmueller acknowledged that he amended the victim's autopsy report because he thought the Defendant's confession was true and that the validity of the amended report depended on the truth of the Defendant's confession.

Dr. Lochmueller acknowledged that placing an infant to sleep face down was dangerous. He said no one told him the victim had breathing problems when she was born. However, that information would not have affected his initial conclusion that the victim died of accidental asphyxia. After Dr. Lochmueller's testimony, the State rested its case.

Vickie Sue Roberts, Ms. Light's mother and the Defendant's former mother-in-law, testified that in February 2011, she and her husband lived in a single-wide mobile home on Tammy Circle. Mrs. Roberts worked at the same Burger King as the Defendant, but Mrs. Roberts worked the morning shift and had to be at the restaurant by 5:00 a.m. On February 22, 2011, Ms. Light decided to spend the night at Mrs. Roberts' home. Ms. Light had been awake for days because she was taking care of the Defendant's ex-stepmother, who was "super sick," and Mrs. Roberts was going to help Ms. Light take care of the victim so Ms. Light could rest. The Defendant was supposed to come to the mobile home when he finished his shift at Burger King.

Mrs. Roberts testified that Ms. Light and the victim slept in the front bedroom and that Mrs. Roberts arranged pillows "up at the head of the bed like a Boppy to put the baby in." Mrs. Roberts slept in the bedroom next to the front bedroom because she had to get up early for work and did not want to wake anyone. Her husband slept in the back bedroom. Mrs. Roberts said that she did not hear the victim screaming or crying and that she did not hear the Defendant cursing. She said she thought she would have heard the victim and the Defendant because her bedroom was close to the front bedroom and because the walls of the home were "[t]hin."

Mrs. Roberts testified that after the victim's death, Detective Davis talked to her about his investigation "many times." She told him that while she was getting ready for

work on the morning of February 23, she thought she heard "a noise" that sounded like the victim. Mrs. Roberts considered checking on the victim but decided not to bother Ms. Light and the Defendant and left for work at about 4:30 a.m. Defense counsel asked Mrs. Roberts to describe the Defendant with his children, and she said that one of her grandsons "cherished" the Defendant and that she had never seen the Defendant be mean to a child in any way.

On cross-examination, Mrs. Roberts testified that she and Ms. Light arranged the pillows on the bed to surround the victim so that Ms. Light and the Defendant would not roll onto her. Mrs. Roberts said that she normally went to bed at about 6:00 p.m. and that she was not awake when the Defendant arrived in the early morning hours of February 23. She did not remember if she woke during the night. The Defendant had "track marks" on his arm when he met Ms. Light, but Mrs. Roberts never knew him to use intravenous drugs in the bathroom and thought he was "supposed to be trying to get clean." Mrs. Roberts said she never would have left the victim in the Defendant's care if she had known he was using drugs.

At the conclusion of Mrs. Roberts' cross-examination testimony, the trial court allowed the prosecutor to read her a statement written by the Defendant. The State read aloud as follows:

> We took a family outing to, I think, Springbrook. Remembrance in a swing. I got an erection of excitement while holding little girl, just off in a daydream about a girl named Kendra. While swinging I told her that she was the prettiest baby in the world because she was mine, dry humping her through her diaper just to watch her reaction. At that age, of course, her eyes went bright as ever. I told her that I was her daddy, of course, and nothing would ever come of that situation of later age of remembering stages, meaning it was only to see her excitement at that age, reaction or reflex, instantly causing me to stop, telling her if she wasn't mine she would have to be dominated.

After reading the statement, the State asked Mrs. Roberts, "Does that statement from the Defendant change your opinion about whether he would mistreat a child?" Mrs. Roberts answered, "I do not believe it."

After Mrs. Roberts' testimony, the jury convicted the Defendant of second degree murder as a lesser-included offense of first degree premediated murder in count one of the indictment and first degree felony murder committed during the perpetration of aggravated child abuse as charged in count two. The trial court merged the conviction of second degree murder into the conviction of first degree murder and held a sentencing hearing for the jury

- 12 -

to determine whether the Defendant should be sentenced to life or life without parole for first degree murder.[1] During the hearing, the State argued that the jury should impose life without parole because the murder was committed against a person less than twelve years of age and the Defendant was eighteen years of age or older. *See* Tenn. Code Ann. § 39-13-204(i)(1). The jury chose to sentence the Defendant to life without parole.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support his convictions because he did not knowingly treat the victim in a way to cause her injury and because the State failed to corroborate his confession as required by *State v Bishop*, 431 S.W.3d 22 (Tenn. 2014). The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[1] We note that the trial court entered a judgment of conviction for second degree murder but that the trial court did not sentence the Defendant for the offense. As our supreme court has stated, "When the jury returns guilty verdicts on multiple offenses that eventually will be merged, the best practice is for the trial court to impose a sentence on each count and reflect the sentence on the respective uniform judgment document." *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015) (order). Doing so prevents the necessity of an additional sentencing hearing if the greater conviction is reversed on appeal. *Id.*

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code. Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the [underlying felony]." Tenn. Code Ann. § 39-13-202(b). A defendant is guilty of aggravated child abuse when the defendant commits the offense of child abuse and the conduct results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(3). Serious bodily injury is defined as bodily injury that involves

(A) A substantial risk of death;

(B) Protracted unconsciousness;

(C) Extreme physical pain;

(D) Protracted or obvious disfigurement; or

(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or

(F) A broken bone of a child who is eight (8) years of age or younger[.]

Tenn. Code Ann. § 39-11-106(a)(34). "Second degree murder is . . . [a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1).

Taken in the light most favorable to the State, the evidence shows that in the early morning hours of February 23, 2011, the Defendant left Burger King and went to the home

- 14 -

on Tammy Circle where Ms. Light and the victim were spending the night. When he arrived, Ms. Light was tired and told him to feed the victim. The Defendant said he would do so, but first he went into the bathroom and "shot up" morphine. After the Defendant used drugs, he tried to feed the victim, but she was fussy and crying. The Defendant became frustrated with the victim and pushed her face into his chest to "drain her energy" and stop her from crying. Although the victim struggled and grabbed the Defendant's shirt, he continued to squeeze her until she stopped moving. He then went to sleep with her lying on his chest. At some point during the night, the Defendant woke, placed the deceased victim on her back between himself and Ms. Light, and went back to sleep.

As noted by the State, for the Defendant's first degree felony murder conviction, "[I]t is the actual act of treating a child in an abusive manner that must be knowing conduct; a defendant need not know that his or her conduct will result in serious bodily injury." *State v. Prater*, 137 S.W.3d 25, 33 (Tenn. Crim. App. 2003). Here, the Defendant knew from suffocating himself as a child that he could stop the victim's crying by suffocating her. He intentionally pressed her face into his chest and squeezed her. Despite the victim's fighting to breathe and grabbing his shirt, he continued to squeeze her until she went limp. Therefore, while the Defendant may not have intended to cause the victim's death, we conclude that the evidence is sufficient to support his convictions of first and second degree murder.

In a related argument, the Defendant claims that the State failed to corroborate his confession. In support of his argument, he notes that many of the details in his statements to the police, such as his trying to feed the victim milk and cereal from a bottle and the victim's crying and screaming, were inconsistent with the other evidence in the case.

In *Bishop*, our supreme court clarified that Tennessee follows the "modified trustworthiness standard" to assess the corroboration of an extrajudicial confession. 431 S.W.2d at 61. The court explained the standard as follows:

> [T]he trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

431 S.W.3d at 61.

The trial transcript shows that after the State rested its case-in-chief, the trial court addressed *Bishop* and found that the charged offenses involved a tangible injury and that the State provided substantial independent evidence tending to show that the Defendant's statements were trustworthy. We agree with the trial court. The Defendant said in his statements to the police that Ms. Light was tired and asked him to watch the victim and that he fed the victim a bottle of milk and cereal. According to Ms. Light, she told the Defendant to feed the victim, and he agreed. Both the Defendant and Ms. Light said that the Defendant went into the bathroom. The Defendant claimed that he went into the bathroom and used drugs, and Ms. Light testified that the Defendant later told her he "shot up" morphine in the bathroom. The Defendant said that the victim spit up on his shirt and that he threw the shirt onto the floor. Detective Davis testified that he saw a sweatshirt on the bedroom floor and that the sweatshirt appeared to have spit up on it. The Defendant said that sometime after he suffocated the victim, he "laid her in [the] Boppy." Although Ms. Light said that a Boppy pillow was not at the scene, the Defendant's own witness, Mrs. Roberts, testified that she and Ms. Light arranged the pillows "like a Boppy." Moreover, although Ms. Light and Mrs. Roberts testified that they did not hear the victim's crying as the Defendant claimed, both witnesses were asleep while the Defendant was feeding the victim. Finally, Dr. Lochmueller testified that the Defendant's account of the victim's death was consistent with the autopsy findings, of which the Defendant had no knowledge. Accordingly, we also conclude that the evidence is sufficient to provide adequate corroborating evidence to satisfy *Bishop*'s modified trustworthiness standard.

## II. Defendant's Character

The Defendant claims that the trial court committed reversible error when it allowed the State to read his written statement during Mrs. Roberts' testimony and ask her opinion about the statement. The State argues that the trial court did not err. We conclude that the Defendant is not entitled to relief.

At the conclusion of Mrs. Roberts' direct testimony, Defense counsel asked her, "How would you describe [the Defendant] with his children[?]" Mrs. Roberts answered, "I've got another grandson that spent a lot of time with [the Defendant] and he cherished him. I had never seen [the Defendant] be mean to a child in any way." The prosecutor requested that the parties approach the bench and stated, "Your Honor, pursuant to the testimony elicited, I think a 404(b) motion is now going to have to be heard outside the presence of the Jury."

The trial court dismissed the jury from the courtroom, and the prosecutor advised the trial court that before trial, the State "filed a notice of potential 404(b) and 608(b)(3) regarding a written inmate request made by the Defendant on December 20, 2018." The prosecutor further advised the trial court that in the jail request, the Defendant "submitted

- 16 -

about sexually touching his daughter in inappropriate ways . . . and treating her inappropriately in a sexual manner." The prosecutor stated that he "put Defense Counsel on notice that if testimony were to be elicited that [the Defendant] treated his children well, that the State would attempt to use this documentation to impeach . . . or rebut that testimony that was elicited." Defense counsel acknowledged that the Defendant wrote the statement but argued that the State was trying to use the statement to prove a prior bad act; therefore, the trial court was required to consider the issue under Tennessee Rule of Evidence 404(b), which required that the trial court find proof of the prior act to be clear and convincing. Defense counsel also argued that the evidence was "incredibly prejudicial" and that the State could not impeach his character because he had not testified.

The trial court read the Defendant's statement and said, "I'm not sure this is 404(b). I think it may be 404(a)." The prosecutor agreed with the trial court. The trial court asked that the State present proof of the circumstances surrounding the statement, so the State recalled Investigator Angus to the stand. Investigator Angus acknowledged that the statement was an inmate request submitted by the Defendant via a jail kiosk on December 20, 2018, while the Defendant was an inmate in the Blount County Jail.

The trial court ruled that the Defense had elicited testimony about the Defendant's character from Mrs. Roberts under Tennessee Rule of Evidence 404(a) and that it would be "fundamentally unfair" to prohibit the State from asking Mrs. Roberts about the Defendant's statement. The trial court reiterated that "I think it's a 404(a)" issue but also gave an alternate ruling under Tennessee Rule of Evidence 404(b). The trial court found that "this proof is clear and convincing" and that the statement was prejudicial. However, the trial court ruled that the probative value of the evidence outweighed its prejudicial effect because "[i]t's fundamentally unfair to allow the Defense to put on character evidence and then say to the State foul when the State responds."

Later, the trial court revisited the issue under Tennessee Rule of Evidence 404(a). Reading from a legal treatise, the trial court noted that a defendant "may introduce evidence of good character in order to show a lack of propensity to commit a crime. And if the defendant so opens the door to the issue, the prosecution is free to counter the move by offering evidence of bad character to rebut the defendant's proof." The trial court continued reading aloud as follows: "[I]if the defendant opens the door by eliciting character proof, any character witnesses may be cross examined about specific instances of conduct committed by the defendant in order to challenge the character witness's testimony." The prosecutor asserted that it could ask Mrs. Roberts about the Defendant's statement, and Defense counsel responded,

> If the Court please, our position is that the State, unfortunately, can put on any evidence of character . . . that it wants to. We've opened the door and

- 17 -

we're stuck with that. But in order to prove specific crimes, that they can ask Mrs. Roberts has she heard about this, does she know anything about it, does that change her opinion. I think that's clearly valid. I have no objection to that.

The prosecutor read the statement to Mrs. Roberts and asked whether the statement changed her opinion of whether the Defendant would mistreat a child. Mrs. Roberts responded that she did not believe the statement.

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, if a defendant places proof of a pertinent character trait at issue, then the State may offer evidence about the defendant's pertinent character to rebut the same. Tenn. R. Evid. 404(a)(1). In other words, the defendant has "opened the door" to otherwise inadmissible evidence by eliciting *admissible* evidence. *State v. Vance*, 596 S.W.3d 229, 250 (Tenn. 2020). Tennessee Rule of Evidence 405(a) provides that the character evidence may be established by reputation or opinion. If a defense witness gives testimony about the Defendant's character, Tennessee Rule of Evidence 405(a) provides that the State may cross-examine the witness about specific instances of conduct if (1) upon request, the trial court holds a hearing outside the jury's presence, (2) the court determines that a reasonable factual basis exists for the State's inquiry, and (3) the court determines that the probative value of the specific instance of conduct outweighs its prejudicial effect on substantive issues. The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court. *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).

Turning to the instant case, Mrs. Roberts made a sweeping claim during her direct testimony: that she had never seen the Defendant mistreat a child "in any way." The State sought to impeach her with the Defendant's statement about "dry humping" the victim. Therefore, we agree with the trial court that Tennessee Rule of Evidence 404(a)(1) was the appropriate rule. Although the Defendant contends on appeal that Mrs. Roberts' testimony was not character evidence under Tennessee Rule of Evidence 404(a) and that the trial court erred by allowing the State to read his statement, Defense counsel stated at trial that he opened the door to the Defendant's character and that "the State can put on any evidence of character . . . that it wants to." Defense counsel also did not object when the State said that it was going to read the Defendant's statement to Mrs. Roberts. Therefore, the Defendant cannot now complain that the trial court erred. *See* Tenn. R. App. P. 36(a).

- 18 -

## CONCLUSION

Upon our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE